IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

STATE OF TENNESSEE,

    Plaintiff,

v.                                                No. 1:08-cr-10100

DEXTER WAYNE DODD,

    Defendant.

---

ORDER REMANDING CASE TO STATE COURT

---

The Defendant, Dexter Wayne Dodd, was indicted on September 2, 2008 in the Madison County (Tennessee) Circuit Court, case number 08-507, on one count of forgery, one count of identity theft, and one count of theft of property under five hundred dollars, all in violation of Tennessee state law. See Tenn. Code Ann. §§ 39-14-103, -114, -150 (respectively). Dodd sought to remove this state prosecution to federal court pursuant to 28 U.S.C. § 1442(a)(1). On November 3, 2008, the Madison County grand jury issued a superceding indictment, case number 08-657, which included five counts, four counts of theft of property under $500 and one count for theft of property over $1,000. Tenn. Code Ann. § 39-14-103. The State of Tennessee nolle prosequied the initial indictment on November 13, 2008. Because Dodd has asserted no colorable federal defense to any of the counts in the superceding indictment, the Court REMANDS this proceeding to state court for further prosecution.

1

FACTUAL BACKGROUND

The Defendant works as a letter carrier for the United States Postal Service ("USPS") at the Main Station in Jackson, Tennessee. (Docket Entry ("D.E.") No. 8, State's Resp. to Notice of Removal, at ¶ 8; D.E. 11, Declaration of Dodd, at ¶ 2.) According to his supervisor, Vicki Cox, several customers on Dodd's route complained about not receiving their mail during the period from January to March 2008. (D.E. 11, OIG Letter, at 2-3.) As a result, Cox reported to the USPS Office of Inspector General ("OIG") that Dodd had failed to deliver mail in dereliction of his duties. (Id. at 2.) OIG special agents subsequently conducted an investigation.

OIG agents contacted Lucretia Allen, a postal customer who had filed several complaints against the Defendant. Since moving into her house in April 2007, she claimed she had received only two utility bills. (Id. at 3, 5.) Allen could not explain why she was not receiving her mail, but speculated that her "carrier may have a personal vendetta against her." (Id. at 5.) The investigators coordinated with the Memphis Processing and Distribution Center to conduct a database search for change of address forms. (Id. at 4.) The search uncovered two change of address forms filed under Allen's name. (Id.) The first form was purportedly submitted by Allen in July 2007. (Id.) The second was an Employee Generated Change of Address form presented by Dodd in October 2007. (Id.) Cox informed the agents that in January 2008–after receiving several calls from Allen–she instructed Dodd to cancel the Change of Address form, sign the Correction to Mail Forwarding Change of Address, and resume delivering Allen's mail. (Id. at 3.)

The agents also interviewed Jeffrey Clark, another postal customer who had lodged complaints against Dodd. (Id. at 5.) Clark stated that he had lived at the same residence in Jackson since June 1997, but did not have problems receiving his mail until 2005, after Dodd took over the

2

route.  (Id.)  Clark also believed that Dodd held a grudge against him.  (Id.)  He speculated that this situation arose in 2005, when Dodd overheard Clark complain about him to another postal customer and refer to him as "ignorant."  (Id.)  Clark provided the agents with a piece of first class mail addressed to him, dated May 29, 2008, which bore the notation "Attempted not Known and Returned to Sender."  (Id. at 5-6.)  According to Clark, the mail contained employee insurance forms sent by his employer.  (Id.)  Once the letter had been returned after an unsuccessful attempt to send it to his residence, his employer resent it to his office.  (Id.)  Clark claimed that he had never submitted a change of address form and believed that Dodd was intentionally refusing to deliver his mail.[1]

The OIG investigators also examined mail at Dodd's work station that the Defendant had sorted as undeliverable.  Cox presented them with 432 pieces of Bulk Business Mail, which she said were "deliverable" but were found in the "undeliverable" tub at the Defendant's work station.  (Id. at 3.)  The agents located available recipients for 23 out of a random sample of 30 pieces of mail from the "undeliverable" bin.  (Id.)  About a month later, Cox informed the OIG that she again found several pieces of "deliverable" mail that had been discarded in the Defendant's tub.  (Id. at 4.)  She related that some of these pieces of mail were addressed to "Current Resident," and that the USPS maintained specific policies regarding delivery of mail with such designation.  (Id. at 5.)

On July 2, 2008, the agents conducted surveillance of Dodd as he worked his route.  (Id. at 5-6.)  Around 3:25 p.m., the agents observed Dodd parked behind a local church.  (Id. at 6.)  They approached Dodd and identified themselves as OIG agents.  (Id.)  Upon the agents asking why Dodd had stopped behind the building, he responded that he was checking his mail.  (Id.)  One of the

---

[1]The agents also noted complaints of undelivered mail from other postal customers, Nghia Nguyen and LaTonya Mosley, who were on the Defendant's route.  (D.E. 11, OIG Letter, at 4.)

3

agents questioned Dodd about when his shift ended, and he replied "when I'm ready." (Id.) When asked again, Dodd said "about 4:30." (Id.) The Defendant then entered his vehicle and returned to the post office. (Id.) The agents later attempted to speak with Dodd about the complaints that had been made against him, but he never agreed to be interviewed. (Id.) On the first attempt, Dodd refused because he was "off the clock," and on the second, Dodd demanded to have a union representative present, though none was available. (Id.)

After the OIG concluded its investigation, Assistant Special Agent Fred Johnson sent a letter describing the OIG's findings to District Attorney General James G. Woodall. (Id. at 1-8.) Johnson's letter concluded that the Defendant had "refrained from performing his official duties as imposed by state law and federal statute relating to his employment, by intentionally and knowingly failing to deliver United States mail entrusted to his care and control." (Id. at 1.)

As to the charges brought in the initial indictment, the Defendant claimed that, based on his interpretation of the discovery materials provided by the State of Tennessee, the forgery and identity theft charges stemmed from an Employee Generated Change of Address form he generated in October 2007.[2] (D.E. 1, Notice of Removal, at 1.) Count 1 of the indictment, however, stated that the forgery involved a form labeled "Official Mail Forwarding Change of Address Order,"[3] which

---

[2] The USPS City Carrier Handbook provides that letter carriers are permitted to submit Employee Generated Change of Address forms under certain circumstances "[w]hen a customer moves and does not leave a forwarding order." (D.E. 11, Handbook, § 241.15.) Dodd claims that he submitted this form because he "was under the belief that [Allen] had moved from her residence and did not complete a Change of Address form, or provide a new address to the USPS." (D.E. 11, Declaration of Dodd, at ¶ 12.) The Defendant further states that he was later informed that Allen still lived at the address on his route, and thus, he resumed mail delivery to her. (Id.)

[3] Based on the exhibits attached to the OIG letter, the "Official Mail Forwarding Change of Address Order" is distinct from the "Employee Generated Change of Address" form. (D.E.

4

was dated July 10, 2007, and apparently bore the signature of Allen. (D.E. 1, Lower Court Documents, at 10.) Concerning Count 3, Dodd asserted that he had a "good faith belief that the [mail in question] was undeliverable" and followed all procedures in the USPS City Carrier Handbook ("Handbook") regarding undeliverable mail. (Id. at ¶ 17; D.E. 11, Handbook §§ 241.15, 242.61, 441.)

Ten days after the indictment was returned, the Defendant sought to remove prosecution of his case to this Court. As grounds for this action, the Defendant asserted two federal defenses, immunity and preemption. (D.E. 11, Def.'s Pretrial Mem., at 13, 16.) The Court conducted an evidentiary hearing on the question of removal on September 26, 2008, at which Cox testified. (D.E. 12.) At that proceeding and at a subsequent status conference, the State indicated that it would be pursuing a new indictment against Dodd at the next meeting of the grand jury. (D.E. 14.) As a result, the Court advised the parties it would withhold its ruling until after the return of the grand jury in November. (Id.)

On November 3, 2008, the state grand jury issued a superceding indictment. (D.E. 15.) The superceding indictment included five counts of theft of property in violation of Tenn. Code Ann. § 39-14-103 that were allegedly committed against Lucretia Allen, Jeffrey Clark, Valerie Transou, Helen Vann, and Charles Merriweather. (Id.) Following the entry of the Order of Nolle Prosequi (or dismissal) on November 13, 2008, the forgery and identity theft counts were no longer part of the charges against Dodd. (D.E. 16, Order.) On December 2, 2008, the Defendant filed a "Status Report" with this Court indicating that he would be relying on his previously-filed documents to support his petition of removal of the superceding indictment. (D.E. 16, Status Report.)

---

11, Presentation Letter and Exhibits, Ex. 9, at 3-4.)

STANDARD OF REVIEW

In certain instances, a criminal defendant who is a federal officer may remove to federal court the state prosecution of which he is the subject. This source of federal jurisdiction is derived from 28 U.S.C. § 1442(a), which states:

> A civil action <u>or criminal prosecution</u> commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act <u>under color of such office</u> or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a) (emphasis added). Basically, the statute provides two prerequisites to federal jurisdiction: (1) that the defendant was a federal officer; and (2) that the alleged criminal conduct was committed under the color of office.[4] <u>Id.</u> The United States Supreme Court has further

---

[4] 28 U.S.C. § 1446(c) provides, in part, for certain procedures in connection with the removal of a criminal prosecution:

> . . . .
> (2) A notice of removal of a criminal prosecution shall include all grounds for such removal. A failure to state grounds which exist at the time of the filing of the notice shall constitute a waiver of such grounds, and a second notice may be filed only on grounds not existing at the time of the original notice. For good cause shown, the United States district court may grant relief from the limitations of this paragraph.
> . . . .
> (4) The United States district court in which such notice is filed shall examine the notice promptly. If it clearly appears on the face of the notice and any exhibits annexed thereto that removal should not be permitted, the court shall make an order for summary remand.
> (5) If the United States district court does not order the summary remand of such prosecution, it shall order an evidentiary hearing to be held promptly and after such hearing shall make such disposition

explained that, in order for a state criminal prosecution to be removed, a defendant must also raise a "colorable federal defense."[5] Mesa v. California, 489 U.S. 121, 129, 109 S. Ct. 959, 103 L. Ed. 2d 99 (1989).

In Mesa, the State of California charged two letter carriers with misdemeanor-manslaughter and driving outside a laned roadway because they, in separate incidents, collided with a bicyclist and a police car. The letter carriers argued that their cases should be removed under § 1442(a) because they were "acting in the course and scope of [their] employment" for the federal government at the time of the accidents. The Supreme Court unanimously rejected this argument, finding that the appropriate inquiry centered upon whether the defendants had alleged a colorable federal defense. Id. at 129. The Court noted that § 1442(a) "merely serves to overcome the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." Id. at 136-37 (citing Merrell Dow Pharm. Inc. v. Thompson, 478 U.S. 804, 808, 106 S. Ct. 3229, 92 L. Ed. 2d 650 (1986)). However, the Court indicated that this grant of federal jurisdiction generally should be reserved for when "true state hostility . . . was specifically directed against federal officers' efforts to carry out their federally mandated duties." Id. at 139. The Court emphasized a strong judicial policy against the federal courts disrupting state criminal proceedings. Id. at 138 (quoting Arizona

---

of the prosecution as justice shall require. If the United States district court determines that removal shall be permitted, it shall so notify the State court in which prosecution is pending, which shall proceed no further.

[5]The Supreme Court stated that, by using the expression "under color of office," Congress meant "to preserve the pre-existing requirement of a federal defense for removal." Mesa, 489 U.S. at 135. Because § 1442(a) is a purely jurisdictional statute, a federal defense is required to establish Article III "arising under" jurisdiction. Id. at 136; U.S. Const., Art. III, § 2, cl. 1.

7

v. Manypenny, 451 U.S. 232, 243, 101 S. Ct. 1657, 68 L. Ed. 2d 58 (1981)). The Mesa Court also quoted Justice Brandeis from his opinion in Gay v. Ruff, 292 U.S. 25, 34, 54 S. Ct. 608, 78 L. Ed. 1099 (1934) (a civil case), who noted that the trend of legislation has been that "the federal character of the litigant should not alone confer jurisdiction upon a federal court." Id. at 131. Thus, the Court concluded that the mere fact that a postal worker committed a state crime in the course of federal employment was itself insufficient to invoke removal jurisdiction.

Like the postal workers in Mesa, the Defendant in this case was undoubtedly a federal officer. Thus, the key determination is whether he has asserted a colorable federal defense. Id. at 129. At this stage, the Defendant need not conclusively prove the defense, but he must assert facts that would be adequate to establish one at trial. Cf. New York v. Tanella, 239 F. Supp. 2d 291, 296 (E.D.N.Y. 2003) (stating that, in determining whether a case may be removed,"the federal officer need not prove or prevail on his defense; he needs merely to raise it") (citing Willingham v. Morgan, 395 U.S. 402, 407, 89 S. Ct. 1813; 23 L. Ed. 2d 396 (1969)).

ANALYSIS

I.     Federal Immunity

The Defendant first argues as a defense that he is entitled to immunity under the Supremacy Clause of the United States Constitution. The Supremacy Clause, found at Article VI, Clause 2, states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

8

The Supreme Court has determined that the Supremacy Clause provides immunity from state criminal prosecution of federal officers in certain situations. See, e.g., Cunningham v. Neagle, 135 U.S. 1, 34 L. Ed. 55, 10 S. Ct. 658 (1890) (finding federal immunity for a U.S. marshal who shot a person while defending a United States Supreme Court justice); Tennessee v. Davis, 100 U.S. 257, 25 L. Ed. 648 (1880) (immunity from state prosecution recognized for a deputy tax collector who seized moonshine stills, was fired upon, and returned fire, killing a man). In interpreting Supreme Court case law, the Sixth Circuit has stated that federal courts should apply a two-part test in determining whether a state court has jurisdiction to prosecute a federal officer for violating a state criminal code:

> [A] state court has no jurisdiction if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do.

Kentucky v. Long, 837 F.2d 727, 744 (6th Cir. 1988).[6] Much of the Long Court's analysis hinged on the "necessary and proper" prong.

In illustrating how to apply this standard, the Sixth Circuit relied upon the decision of In re

---

[6] The decision in Long further noted that the principles underlying federal immunity can be traced to the Supreme Court's opinion in McCulloch v. Maryland, 17 U.S. 316, 4 L. Ed. 579 (1819). The appellate court quoted Chief Justice John Marshall in Osborn v. President, Directors & Co. of Bank of the US, 22 U.S. 738, 6 L. Ed. 204 (1824), when he wrote in dictum:
> It is no unusual thing, for an act of congress to imply, without expressing, this very exemption from state control. . . . The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted, that all who are employed in them, are protected, while in the line of duty; and yet this protection is not expressed in any act of congress. It is incidental to, and is implied in, the several acts by which these institutions are created, and is secured to the individuals employed in them, by the judicial power alone; that is, the judicial power is the instrument employed by the government in administering this security.

Long, 837 F.2d at 742 (quoting Osborn, 22 U.S. at 865-66) (emphasis added).

McShane's Petition, 235 F. Supp. 262 (N.D. Miss. 1964). The facts of McShane arose from the violence that ensued from the desegregation of the University of Mississippi. After the Fifth Circuit ordered that James Meredith be admitted to the University, the Attorney General of the United States sent U.S. marshals, led by James McShane, to enforce the court order. Id. at 266-67. When the marshals arrived, protestors gathered and eventually began to throw objects at them. Id. at 268-69. As tensions escalated, McShane ordered his men to fire tear gas into the crowd, and a riot ensued that resulted in the death of two people. Id. at 269-70. McShane was indicted in state court for breaching the peace and inducing a riot. Id. at 264. Ultimately, a federal district judge granted McShane's petition for a writ of habeas corpus because the marshal had been acting under orders from the Attorney General. Id. at 275. The district court found that McShane was entitled to immunity because, in ordering the marshals to fire tear gas into the crowd, "he had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an <u>honest and reasonable</u> belief that what he did was necessary in the performance of his duty to see to the execution of the two court orders." Id. (emphasis added).

In Long, the Sixth Circuit interpreted McShane to exemplify the notion that "a mistake in judgment or a 'botched operation,' so to speak, will not of itself subject a federal agent to state court prosecution." 837 F.2d at 745. In other words, there is a difference between "an error of judgement [and] an act done wantonly and with criminal intent." Id. (discussing Clifton v. Cox, 549 F.2d 722 (9th Cir. 1977)). The Long court stated that the key issue in a "necessary and proper" inquiry is whether the federal officer "employed means which he could consider reasonable in the discharge of his duty." Id. The court then noted that the "necessary and proper" test contains both an objective and subjective component. Id. "On the subjective side, the agent must have an honest

10

belief that his action was justified. On the objective side, his belief must be reasonable." Id.

Procedurally, the Sixth Circuit has directed district courts to resolve the question of federal immunity early in the proceedings "in order to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the issue decided." Long, 837 F.2d at 752.

II. Whether Dodd Has Asserted Federal Immunity

The documents that the parties have filed with this Court do not provide a clear picture of the circumstances surrounding the current charges against the Defendant. In the new indictment, the State generally alleges that Dodd committed theft of property against five named victims. Two of these victims, Allen and Clark, were referred to in the OIG's letter, which described an investigation of Dodd, but the other three victims' names do not appear anywhere except in the superceding indictment. The evidence that had been presented by the Defendant at the hearing did little to clarify the underlying narrative driving the new indictment. He made a declaration regarding the substance of the original indictment, but, because his declaration predated the superceding indictment, it did not directly discuss the most recent counts of theft against him. His declaration asserts that the State's original accusation of theft arose from him "marking some first class mail that I considered to be undeliverable to be returned to sender, or because I placed some Bulk Business Mail . . . that was undeliverable in the Undeliverable Bulk Business Mail . . . tub located at my workstation." (D.E. 11, Declaration of Dodd, at ¶ 13.) Because the Defendant has stated that he will rely on his previous filings[7] in attempting to assert a federal defense, the Court infers that Dodd is

---

[7]Much of the Defendant's argument in his memorandum of law attempts to establish a federal defense to the forgery and identity theft charges levied in the original indictment. (D.E. 11, Def.'s Pretrial Mem., at 8-9, 16.) The state court has since issued an order of nolle prosequi as to the original indictment, and these counts were not included in the superceding indictment.

renewing his assertion that the State's allegations of theft, which now appear in the superceding indictment with named victims, arose from his designation of certain pieces of mail as undeliverable.[8] (D.E. 16.) Thus, the Court will consider whether the law affords Dodd the defense of federal immunity under these circumstances.

The Defendant argues that he is entitled to immunity for his official actions because postal policy authorized him to designate mail as undeliverable, and these actions were no more than what was necessary and proper to perform this authorized task, considering that he believed, in good faith, that the letters were undeliverable. Considering this evidence as presented, Dodd has established the first prong of the Long test. Specifically, he points to portions of the Handbook[9] showing that letter carriers are authorized to designate mail as undeliverable in a variety of circumstances.[10] (D.E. 11, Declaration of Dodd, at ¶ 20.) The Defendant has also stated that every letter carrier has an

---

[8] Given the investigative findings detailed in the OIG letter, the Defendant's characterization of the indictment seems unlikely. (See generally D.E. 11, OIG Letter (where designating deliverable mail as undeliverable was just one of several allegations of misconduct made against Dodd).) The State has presented no documentary evidence that directly contradicts that Defendant's view of the counts of theft or clarifies the charges against him. Thus, for the purpose of deciding whether the Defendant has asserted federal immunity, the Court will take this portion of the Defendant's argument as true.

[9] Courts have said that an internal agency handbook "is entitled to deference to the extent it is persuasive, and it is entitled to great deference insofar as it is interpreting the agency's own regulations." Newton v. FAA, 457 F.3d 1133, 1136 (10th Cir. 2006) (citing United States v. Mead, 533 U.S. 218, 226-27 (2001)); see also Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1272 (10th Cir. 2007).

[10] The handbook indicates that mail is considered undeliverable when customers have moved and left no forwarding instructions, mail is addressed to customers who are temporarily away and the retention period for holding mail has expired, mail is addressed to customers who are deceased and the mail cannot be properly delivered to another person, mail is refused, there is no mail receptacle, the address is not known at the place of address, the address number is non-existent, the address is insufficient, the addressee abandons or fails to claim mail, or the mail is returned for postage. (D.E. 11, Handbook, at 31, §§ 242.61-63.)

undeliverable mail tub at his or her work station, and the carriers are expected to sort this mail each morning. (Id. at ¶ 14-15.) If Dodd reasonably and honestly believed that one of the enumerated situations in the Handbook applied, it would appear that postal policy authorized him to classify mail as undeliverable.

With regard to the second prong under Long, the Court must determine whether the Defendant's designation of mail as undeliverable, which later proved to be incorrect, was necessary and proper for him to carry out his authorized duty. This inquiry has both a subjective and objective component. Long, 837 F.2d at 745. The Defendant's argument focuses mainly on the subjective component. Dodd asserts that "[a]ny mail that [he] placed in his [undeliverable] tub on the dates in question was placed there on his good faith belief that the [mail] was undeliverable [and] Mr. Dodd based his decision on whether [the mail] was deliverable upon his training, USPS policies and practices, and his knowledge of his route." (D.E. 11, Def.'s Pretrial Mem., at 10.) In other words, Dodd claims that he had a good faith belief that the mail was undeliverable. This sufficiently establishes the subjective component of "necessary and proper," but the objective component is more problematic.

The OIG letter details several instances when the Defendant failed to deliver mail. Cox, the Defendant's supervisor, stated that she received numerous customer complaints in early 2008. (D.E. 11, OIG Letter, at 2-3.) Specifically, postal customers Allen, Clark, Nguyen, and Mosley stated that the Defendant failed to deliver their mail. (Id. at 3-5.) On April 8, 2008, Cox presented the OIG special agents with over 400 pieces of mail that the Defendant had designated as undeliverable, most of which were later found to be deliverable. (Id. at 3.) Approximately a month later, Cox again reported that the Defendant's "undeliverable" tub contained pieces of mail, which bore the names

13

of recipients who had not filed change of address forms. (Id. at 3-4.) Although, some of this mail was addressed to "Current Resident," Cox implied that the Defendant failed to handle this type of mail "according to U.S. Postal Service policy." (Id. at 4.)

Given the repetitiveness of the Defendant's actions over a period of time, the Court cannot find that his conduct resulted from a reasonable interpretation of his authorized duties. When considering his mistakes in the aggregate, the surrounding circumstances of the allegations indicate that the Defendant displayed, at minimum, an indifference to the delivery of his customer's mail. See McShane, 235 F. Supp. at 273 (stating that "[t]he standards by which the act committed by the [officer] are to be measured must take into account the circumstances existing at the time"). This conduct, if true, would rise above the level of a mere "mistake in judgment." Long, 837 F.2d at 745. A few instances where a letter carrier incorrectly designates mail, in good faith, would not normally strip the letter carrier of the federal immunity defense. Federal policy seemingly grants letter carriers some discretion to exercise their honest and reasonable judgment in determining what mail is deliverable and what is not. (See D.E. 11, Handbook, §§ 242.61-63.) However, a letter carrier can abuse that discretion. See McShane, 235 F. Supp. at 273 (stating that immunity only applies when federal officers act "in the exercise of sound discretion") (quoting Castle v. Lewis, 254 F. 917, 926 (8th Cir. 1918)). The pattern of misfeasance herein indicates a willful disregard of his duties, and these mistakes are further aggravated by the lack of any urgency in the context in which his decisions were made. See id. at 272 (stating that immunity would not apply if the actions taken "'exceeded the exigency of the process under which [the officer] acted'") (quoting Ex parte Jenkins, 13 F. Cas. 445, 448 (E.D. Pa. 1853)). The acts of misconduct, as alleged, simply cannot be the result

of a reasonable interpretation of USPS policies and practices.[11]  For this reason, the Defendant has not shown that he <u>objectively</u> did no more than what was necessary and proper to carry out his official duties.  <u>Long</u>, 837 F.2d at 744.  Thus, he has failed to meet the second requirement for asserting a colorable claim of federal immunity.

      III.     <u>Whether the Defendant Has Asserted a Defense of Preemption</u>

Finally, Dodd argues that "the state criminal laws for which he is being prosecuted [are] preempted by federal postal regulations under the Supremacy Clause."  (D.E. 11, Def.'s Pretrial Mem., at 16.)  As a basis for this preemption, he points to Article I, section 8 of the United States Constitution, which gives Congress the power "[t]o establish Post Offices and Post Roads."  He also references the Postal Reorganization Act, which declares that the USPS is "an independent establishment of the executive branch of the Government of the United States."  39 U.S.C. § 201.  Finally, the Defendant cites the case of <u>Johnson v. Maryland</u>, 254 U.S. 51, 41 S. Ct. 16, 65 L. Ed. 126 (1920), wherein the Supreme Court held that a state could not require a postal employee to obtain a state driver's license to deliver mail in his government mail truck.  The Defendant quotes from a portion of <u>Johnson,</u> in which Justice Holmes wrote:

> It seems to us that the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on.  Such

---

[11]The Defendant asserts that "the OIG's investigative conclusions presented, at worst and in viewing the investigative findings in the light most favorable to the OIG, differences in interpretation of USPS policies and practices between the OIG and Mr. Dodd . . . ."  (D.E. 11, Def.'s Pretrial Mem., at 2.)  This may be true.  Pursuant to the <u>Long</u> test, however, if the Defendant's interpretation of USPS policies was unreasonable, federal immunity is unavailable.  <u>Long</u>, 837 F.2d at 745 (in an interpretation of federal immunity case law, stating that the "substance of the standards applied in the foregoing cases is that of honest and reasonable belief") (quoting <u>McShane</u>, 235 F. Supp. at 274).

15

> a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient. It is the duty of the Department to employ persons competent for their work and that duty it must be presumed has been performed.

Johnson, 254 U.S. at 57 (citing Keim v. United States, 177 U.S. 290, 293, 20 S. Ct. 574, 44 L. Ed. 774 (1900)).

The Defendant is mistaken that Johnson established federal preemption as to regulation of postal workers' conduct. To the contrary, this case simply involved an application of federal immunity. The Johnson Court clearly spoke of "immunity of the instruments of the United States from state control in the performance of their duties." Id. at 57 (emphasis added). In its interpretation of the Supreme Court's holding, the Sixth Circuit characterized Johnson as an application and extension of Neagle, which is another federal immunity case. Long, 837 F.2d at 743-44 (citing Neagle, 135 U.S. at 75). Specifically, Johnson noted with approval the prohibited enforcement of state laws attempting "to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States," but not state laws incidentally affecting the way in which a federal officer carries out his duties. Johnson, 254 U.S. at 56-57. Considering that the Johnson Court articulated the same standard as that for federal immunity, the Defendant's position under this case is duplicative of his previous argument, which this Court has rejected for the reasons stated supra.

The Court finds no other legal basis for the Defendant's claim of federal preemption by postal regulations over state crimes committed by postal employees. The law is clear that "an employee of the United States does not secure a general immunity from state law while acting in the course of his employment." Id. As the Supreme Court has noted, "under our federal system, it goes

without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government. Because the regulation of crime is pre-eminently a matter for the States, we have identified a strong judicial policy against federal interference with state criminal proceedings." Manypenny, 451 U.S. at 243 (citations and internal quotations omitted). More importantly, to hold that federal postal regulations preempt state law as to acts committed by postal workers on the job would serve as a general grant of immunity, and that result is precisely what the Supreme Court disallowed in Mesa, 489 U.S. at 129.

CONCLUSION

For the reasons articulated herein, the Court hereby **REMANDS** this case to the state court for further prosecution.

IT IS SO ORDERED this 6th day of January, 2009.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE